*In the Circuit Court of Law for Henrico County—Criminal Term.*

Commonwealth
*vs.*  } Friday, November 1st, 1850.
John Campfield.

For the Prosecution, J. B. Young, Commonwealth's Attorney.

For the defence, John H. Gilmer.

The Prosecution was founded on Sec. 11, Chapter 192, Code of Virginia.  Page 828.

"Any free person who shall be guilty of burglary, shall be confined in the penitentiary not less than five, nor more than ten years.  If a person break and enter the dwelling house of another in the night time with intent to commit larceny, he shall be deemed guilty of burglary, though the thing stolen, or intended to be stolen, be of less value than twenty dollars."

The Indictment charged that the accused, on the 13th of October, 1850, at about the hour of 9 o'clock at night, burglariously broke and entered the dwelling house of Jesse Barnes and Martin Sweeney, with intent to steal the goods of Jesse Barnes and Martin Sweeney.

The prisoner was a youth apparently not more than 16 or 18 years of age, with dark complexion, black hair and prominent eyes—Short, but very stoutly formed.  He was arraigned and pleaded "Not Guilty" to the indictment.

The following composed the Jury :

George Lynch, Antoine Bine, Henry Shuty, James Kersey, Charles Ellis, George W. Carter, James M. Carter, Joseph C. Burton, Alfred Gwathmey, A. Hirsh, William P. Mayo, Charles D. Yale.

The examination of witnesses commenced at about 5 o'clock in the evening.

For the prosecution:

*Jesse Barnes, sworn.*—On the 13th of October last, at about 9 o'clock at night, I came home; I found the young man, the prisoner, in my house; I butted up against him when I came in. I asked him, who he was: he said, "hush! don't make any racket, I am only after a darkie." I then seized him; he struggled and tried to run; I called to a colored boy of mine to come; he came and we caught him and held him. Thinking my upper room not a safe place to keep the prisoner, we carried him to the cage; there we searched him and found on him a chisel, a nipper and a skeleton key—(here *Mr. Gilmer* interposed and required the production of the alleged articles if they could be produced: *Mr. Young* directed them to be brought in) *examination in chief continued.* When I came to the door that night and put my key to it, it opened at once; the prisoner said nothing at first; the door had been forced open; I could see the print of the chisel on the edge; the bolt was somewhat bent; I had locked the door on going out to church this night; I went out about 7 o'clock. When we caught him and held him he cried "Murder!"—(at this point, a key, a chisel and a pair of nippers such as would be suited to grasp the end of a key in a lock were produced.) *Witness.* These are the articles found on him at the cage. The house is mine and Martin Sweeney's: the goods belong to both of us; we sleep there; the door I have spoken of opens into the private part of the house.

*Cross examined by Gilmer.*—Our store is under the same roof with the house; the door I have spoken of is in the rear; there is a brick wall on one side; I did not lock the outer gate when I went out to church; a passage from the rear door leads into the private part of the house; there is a door from the passage opening into the store. When I came in, the prisoner was right behind the door; he was in the passage and I consider that he was in my dwelling-house. There is a door at the top of the steps leading up from the passage, which might be locked when we chose to do so; the prisoner was inside the entry or passage; he would have been obliged to break open the rear door and then the inner door in the passage in order to get into the store. Martin Sweeney and I both keep house together. I came up against the prisoner. There was no black girl about the

premises; my boy was not on the lot when the struggle commenced; Campfield halloed and I called out and my boy came from the street. The door at the head of the steps was open, but after searching, we could not discover that any thing was missing.

*Richard H. Barnes, sworn.* I came from church that night; my brother went on a little before me ; I heard a noise and on coming up found my brother and a black boy in charge of the prisoner. I helped to carry him to the cage. I asked him what he was after. He said "Nothing but a darkie." I asked him if he thought it was right to break open a house for such a purpose; he said nothing then, but asked to be permitted to go to the boarding house where the gentleman was with whom he said he was. I told him no, he must go to the watch-house; he then cried a good deal. At the watch-house we found these articles upon him and also a box of matches. On the door spoken of, there was a mark as if made by this chisel, and a piece of the hasp or bolt was burst off, by which means he got in.

*Cross examined.*—He did not say who was the gentleman with whom he was.

*Archibald Wilkinson* (Lieutenant of the night-watch,) *sworn.*—On the Sunday night spoken of, a little after 9, the prisoner was brought to the watch-house by the Messrs Barnes; we searched him and found on him these articles and a box of matches. The next morning I unlocked the door and went in; I asked him if any body was concerned with him ; he answered no. I asked him where he got these things (the nippers) ; he answered, "on the Kanawha." I asked if this was the first attempt of the kind he ever made ; he said, " it was." The boy had been drinking when brought in the night before, but he was not drunk.

*Cross examined.* He was delivered to me as an officer of the police. The conversation I have mentioned was Monday morning before he was carried to the Mayor's court.

*William H. Nuchols, sworn.*—I am one of the police officers of Richmond. On Monday, after examination before the Mayor, I carried the prisoner to the jail. I asked him why he did this; he said "he wanted money to get home, and had no other way." I asked him if he had applied to the gentleman with whom he came, or to his father, would they not have given him money.

He said, " probably they would, but he did not like to ask." He said farther that this was his first attempt. The morning after the arrest, a young man came and claimed the hat the prisoner had, saying it was his, and that the prisoner had said he wanted him to loan it to him, as he was going out after a girl.

Here the evidence for the prosecution closed.

*For the Defence.*—The first evidence was in writing, as follows : " The Attorney for the Commonwealth admits as in evidence, on the part of the prisoner, that he is a resident of the State of Kentucky—that he there bore a good character, and left there to come, and did come to Richmond, as one of the drovers of a number of horses and mules, and that there is no reason to believe that he ever had any acquaintance with Morris C. Faris or H. W. Now elsewhere than in the City of Richmond. The said Attorney, however, reserves the privilege of proving any admission of said prisoner, which is legal evidence wherever made, or of introducing any other legal evidence whatever."

This paper was read to the Jury.

*William H. Freeman, sworn*—My wife keeps a boarding-house ; our residence is about one hundred feet from Barns' grocery. I first saw the prisoner at my house, as a boarder; he was at my house nearly a fortnight. Morris C. Faris and H. W. Now, came to our house about two nights before the 13th of October ; they were both tall young men, apparently about twenty-five years old, one stouter than the other ; I did not like their appearance ; the morning after this house-breaking, they left without paying their bill. Another gentleman slept in the same room with them. After these two men left, there was found in their room this paper. (Here *Young* interposed, and objected to the admission in evidence of this paper; the Court examined it, and after a brief discussion between the Commonwealth's Attorney and the prisoner's Counsel, the Court decided that the paper was inadmissible. *Mr. Young* then consented that it should be read to the Jury.) It is as follows :

OCTOBER 13TH, 1850. RICHMOND, VA.

*Dear Sir,*—I take this opportunity of informing you that I am well at present, hoping that these few lines will find you enjoying the same blessing. I have no news to write at present, more

2

than we landed in Richmond Friday morning, on the packett, and got a seat of work, though I do expect to start to Norfolk in a few days in the Steam-Boat, and where I may go from there I don't know.  I don't expect to return to old Prince Edward in some time.  I must close my letter.  Give my respects to Mr. Noell and family, and Mr Soures and family.  Hudson sends his best respects to his father, and mother, and sisters.  I must close my letter.  This wide world is my home.

Your respects,          MORRIS C. FARIS.

R. S. HINES.—*Sir*, I will send you what I am due in a short time.  You need not be uneasy about it, sir.  My best respects and kind and affectionate respects to your father's family and save the best part for yourself.  I am going to start to Norfolk in a few days if nothing happens.  Yours respectfully,

H. W. Now.

*Wm. H. Freeman—examination in chief continued.*  The name of the man who slept in the same room was McSoully.  I think I saw a conversation between the prisoner and one of these two men; one of them gave the prisoner his hat.  Campfield's hat was drab, the other was black.  Mr. Perkins brought this young man to my house; he paid all his bill; he appeared to be with Mr. Perkins.  On Sunday evening, the 13th, the prisoner had been drinking liquor; I think he was not sober.

*George Freeman, sworn*—I am a son of Wm. H. Freeman; I live in the same house.  On the 13th of October, I went up seventeenth Street with Campfield; during the evening I had seen him conversing with two men, the same two who afterwards went off from our house.

*Mr. Gilmer.*—Did you hear any conversation between the prisoner and a black girl that evening?

*Young* objected.—The Court said the question was admissible and might be answered, as the Commonwealth had given in evidence the prisoner's statements on a similar subject and the matter might bear upon the question of intention.

*Witness.*—I saw the prisoner talking with a black girl on Sunday evening; this was on the corner of 17th and Grace streets.  Afterwards Campfield said—(*Young* objected; the Court deci-

ded that the prisoner could not give in evidence his own statements after his interview with the girl )

The interview was about sixty yards from my father's house; this was about 5 o'clock in the evening. Barnes' house is about the middle of the square, but an alley runs by his house. I dont recollect whether it was light or dark that night.

*Cross-examined* —The interview was a square from the corner near to Barnes' house.

*Byrd Page*, (police officer) *sworn*. *Gilmer*.—Mr. Page did you hear any thing said by the prisoner immediately after his examination before the Mayor?

*Young* objected.

*Gilmer* argued that the youth of the prisoner was to be considered in deciding upon the admissibility of his declarations whether offered in evidence for or against him. He referred to cases in which when young prisoners were brought before English magistrates, and after making confession refused to sign, their admissions could not be used in evidence against them. In this case the admissions of the prisoner had been received— admissions made under circumstances which might well be considered as amounting to *moral duress*—admissions made to Capt Wilkinson, who was "a most imposing looking officer," and whose very appearance might awe a young prisoner, and if these admissions were received, it was but just and fair that the subsequent declarations of the accused should be received to rebut them.

*Judge Caskie*.—The declarations of the accused are clearly inadmissible as evidence in his behalf, but I will recall Capt. Wilkinson to know from him more distinctly what were the facts at the time of the prisoner's admissions.

*Capt. Wilkinson* recalled.—There was nothing threatening in my manner or appearance at the time; I held out no promise to him of any kind; the conversation was as I have before stated it.

*Wm. H. Freeman*.—recalled for the defence. The two men left about 7 Monday morning; they brought no baggage; one was very upright in his form, with black hair; he wore striped pantaloons, a frock coat, high-heeled boots.

*Wm H. Nuchols* recalled for the defence. Two men were at the Mayor's court talking with the prisoner; one of them, I

think, corresponded almost exactly with the description given by Mr. Freeman.

Here the evidence closed.

*Mr. Young* asked the Court to say that a breaking into a passage leading from a door to the upper part of a house occupied as a dwelling by persons was a burglarious breaking if done with a felonious intent.   He cited Mayo's Guide, 142.

The Court gave the instruction as asked, but said that *in a criminal case* it was the privilege of the prisoner's counsel to argue against an instruction given by the Court at the instance of the Commonwealth, and that it would not be disrespectful in counsel so to do.

*Young* opened for the Commonwealth.

*Gilmer*, for the prisoner, commented upon the evidence, and urged the youth and destitution of the accused as in some degree extenuating the offence, if offence had been committed. He quoted a sentiment from Bulwer—"it is only by the candle held in the skeleton hand of poverty, that man can read his own dark heart."   Among other points, he contended that the two men spoken of, were of suspicious character from the evidence before the Jury, that as one changed hats with the prisoner, it might reasonably be supposed they gave him the nippers—that it was highly probable one of these men forced the door and the boy entered without intent to steal, or any other felonious intent.

*Young*, in concluding, cited Roscoe's Crim. Evid. 347.

The Jury retired at a quarter past 8, and in about a quarter of an hour returned with a verdict of " Guilty," and ascertained the term of imprisonment in the penitentiary at five years.

When sentence was to be pronounced, and the prisoner was asked if he had any thing to say, he declared that " that chisel never did break that door."

*Judge Caskie.*—John Campfield, I have heard with regret the remark you have just made.   You have been fairly tried, and, as I believe, justly convicted.   Your youth renders your conviction and the circumstances which led to it matter of sorrow, but I cannot doubt that the verdict was righteous and just, and in accordance therewith I have only to pronounce the sentence of the Law.